AO 91 (Rev. 11/11) Criminal Complaint

**FILED IN OPEN COURT**
8/12/2021

# UNITED STATES DISTRICT COURT
### for the
### Middle District of Florida

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| CHARLES LELANDE BOSTON | ) | 3:21-mj- 1386-JRK |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  January 31, 2021 and April 3, 2021  in the county of  Clay  in the
 Middle  District of  Florida , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252(a)(2) and (b)(1) | Distribution of child pornography |

This criminal complaint is based on these facts:

See affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Ashley Wilson, HSI Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  8-12-2021

_____
_Judge's signature_

City and state:  Jacksonville, Florida

James R. Klindt, United States Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Ashley Wilson, being duly sworn, hereby state as follows:

1.      I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), an agency of the United States Department of Homeland Security (DHS), and have been so employed since October 2007. I am currently assigned to the Office of the Assistant Special Agent in Charge Jacksonville, Florida, where I conduct a variety of investigations. Prior to this assignment, I was assigned to the Office of the Deputy Special Agent in Charge Laredo, Texas for approximately 6 years also as a Special Agent. I have a Bachelor's degree in Criminal Justice. I am a law enforcement officer of the United States and am thus authorized by law to engage in or supervise the prevention, detection, investigation or prosecution of violations of federal criminal law. I am responsible for enforcing federal criminal statutes under the jurisdiction of HSI, including violations of law involving the exploitation of children. I participated in a 22-week training program at the Federal Law Enforcement Training Center in Brunswick, Georgia, which included the Criminal Investigator Training Program and ICE Special Agent Training. In my capacity as a Special Agent, I have participated in numerous types of investigations, during which I conducted or participated in physical surveillance, undercover transactions and operations, historical investigations, and other complex investigations. Since becoming a Special Agent, I have worked with experienced

1



Special Agents and state and local law enforcement officers who also investigate child exploitation offenses.

2.      I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423, as well as Florida state statutes that criminalize sexual activity with minors and other methods of child sexual exploitation. In connection with such investigations, I have served as case agent and have served as an undercover agent in online child exploitation cases. During the course of my investigations, I have worked closely with members of the local child exploitation task force comprised of agents and officers from HSI, the Federal Bureau of Investigation (FBI), the Florida Department of Law Enforcement (FDLE), the Jacksonville Sheriff's Office (JSO), the St. Johns County Sheriff's Office (SJSO), and the Clay County Sheriff's Office (CCSO), among other agencies. These agencies routinely share information involving the characteristics of child sex offenders as well as investigative techniques and leads. As a federal agent, I am authorized to investigate and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.      The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers.  This affidavit is being submitted for the limited purpose of establishing

2



probable cause for the filing of a criminal complaint, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that Charles Lelande BOSTON has committed a violation of 18 U.S.C. § 2252(a)(2) and (b)(1) (distribution of a visual depiction using any means and facility of interstate and foreign commerce, that is via the internet, the production of which involved the use of a minor engaging in sexually explicit conduct).

4.     This affidavit is made in support of a complaint against Charles Lelande BOSTON, that is, in Clay County, in the Middle District of Florida and elsewhere, on or about January 31, 2021 and April 3, 2021, BOSTON did knowingly distribute a visual depiction using any means and facility of interstate and foreign commerce, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

5.     On August 11, 2021, I applied for and obtained a federal search warrant for the residence located at 606 Park Avenue, Apt. 604, Orange Park, FL 32073, which I believed to be occupied by BOSTON, and a copy of which is attached hereto as Exhibit A, and the facts and information contained therein are hereby



incorporated by reference.[1]

6.     In the morning of August 12, 2021, HSI Jacksonville Special Agents, along with the Clay County Sheriff's Office and the Orange Park Police Department, executed the aforementioned search warrant at approximately 6:05 a.m. at 606 Park Avenue, Apt. 604, Orange Park, FL 32073.

7.     During the search of BOSTON's apartment, HSI special agents discovered a Cybertron desktop computer on the floor in his bedroom. The desktop computer contained a Toshiba hard drive with the capacity to store 1 TB of data and was manufactured in China.

8.     Clay County Sheriff's Detective and HSI Task Force Officer Ryan Ellis and I made contact with BOSTON. After being advised of and waiving his *Miranda rights,* BOSTON agreed to speak with us. I recorded the interview. During the interview, I showed a picture of two desktop computers that were on the floor in his bedroom. One of the two desktop computers was the Cybertron. When asked if the two desktop computers are still functioning, BOSTON stated, "they're old, um, we don't use them, um, they uh, we planned on getting rid of them, just haven't done so yet." BOSTON denied being familiar with peer-to-peer file sharing. BOSTON admitted to viewing adult pornography and using Internet websites to obtain it.

---

[1] The copy has been redacted to redact personal identifying information consistent with Fed. R. Crim. P. 49.1.

4



BOSTON was asked about child pornography and initially denied viewing it. BOSTON described child pornography as "underage pornography" and when asked if he had seen it, he terminated the interview. BOSTON was overheard by law enforcement telling his mother "I'm sorry" when he made contact with her following his interview with law enforcement. He was also overheard telling his mother when the search warrant was initially executed she asked why "Homeland Security" was at the home, he stated that they were probably there for him.

9.     A preliminary examination of the Cybertron desktop computer on scene by Computer Forensic Analyst Tony Contes during the execution of the search warrant revealed the uTorrent software, which is known to use the BitTorrent protocol and the following two video files[2] located in the Recycle Bin:

> *$RJ7WCO6 (!!! NEW !!! 2010 k▮ 5yo - chunk2 FK pthc best)*
>
> *$R049HPU ((Hussyfan Pthc R@Ygold Babyshivid) M▮ 8Yo)*

10.     I reviewed the two video files listed above and learned the video files do not play the full length, but the portions I am able to view depict the same child sexual abuse material as portions of the complete files that HSI TFO directly received from a device at IP address 73.53.216.240 on January 31, 2021, and April 3, 2021, referenced in Exhibit A. Additionally, the two video files listed above contain

---

[2] The complete names of the files have been redacted to remove the full identification of the purported name of the respective victim depicted.

5



the same file name and are the same size as the video files that HSI TFO directly received from a device at IP address 73.53.216.240 on January 31, 2021, and April 3, 2021, referenced in Exhibit A. I described the video file with the file name *!!! NEW !!! 2010 k█ 5yo - chunk2 FK pthc best.avi* in paragraph 50 of Exhibit A and *(Hussyfan Pthc R@Ygold Babyshivid) M█ 8Yo.avi* in paragraph 55 of Exhibit A. Based on my training and experience, and the fact that they appear to depict children previously identified by law enforcement, I believe both files depict at least one minor engaged in sexually explicit conduct, and therefore constitute child pornography pursuant to Title 18, United States Code, Section 2256.

11. A preliminary examination of the Cybertron desktop computer on scene by Computer Forensic Analyst Tony Contes, during the execution of the search warrant also revealed folders under the username "Chuck," within the "Downloads" folder on his desktop, subfolders labeled as "11 yo," "12 yo," "13 yo," "14 yo," "15yo," and "16 yo." The review is ongoing but, contained within these files, were several still images that appear to be consistent with child pornography, which I also reviewed. One image contained within the "11 yo" folder depicted a prepubescent child partially nude displaying her vagina, which was the focus of the image. Several images were close-up depictions of the vagina of the prepubescent child.

12.     I spoke with BOSTON's fiancée, Carrie Daniels, and was joined by HSI SA Tony Algozzini and Clay County Sheriff's Office Deputy Ben Simmons. Daniels identified the Cybertron desktop computer as a computer she and BOSTON previously used until approximately April or May of this year when they purchased a new computer. Daniels told me that she used the Cybertron desktop computer to connect to the Internet to use the streaming services Hulu and Netflix. Based on my training and experience, I know the streaming services Hulu and Netflix require a connection to the Internet to access the services. Daniels also told me that BOSTON regularly used the Cybertron desktop computer and that she and BOSTON were the only users of the computer.

13.     I know the Internet is a vehicle of interstate commerce.

14.     Based on the recorded statement of Daniels, my preview of the files found on the computer used by BOSTON as compared to the files distributed via BitTorrent, and my investigation, I have probable cause to believe that BOSTON distributed visual depictions of at least one minor engaged in sexually explicit conduct on or about January 31, 2021, and April 3, 2021.

## CONCLUSION

11.     Based upon the foregoing facts, and including those facts set forth in Exhibit A, I have probable cause to believe that, on or about January 31, 2021 and April 3, 2021, Charles LeLande BOSTON committed the following violation of

7

federal law: knowing distribution of a visual depiction using any means and facility of interstate and foreign commerce, when the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct, and the visual depiction was of such conduct in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).

Ashley Wilson, Special Agent
Homeland Security Investigations

Sworn to before me this
this 12 th day of August, 2021

JAMES R. KLINDT
United States Magistrate Judge

8

# Exhibit A



AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

The residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, as further described in Attachment A

)
)
)
)
)

Case No. 3:21-mj- 1382 - JRK

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

the residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, as further described in Attachment A.

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252 & 2252A | Receipt, transportation, possession, and distribution of child exploitation material |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Ashley Wilson, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ and 41(d)(3) over the telephone. _____ *(specify reliable electronic means)*.

Date: 8 - 11 - 2021

*Judge's signature*

City and state: Jacksonville, Florida

James R. Klindt, United States Magistrate Judge
*Printed name and title*

I CERTIFY THE FOREGOING TO BE A TRUE AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
BY: _____ DEPUTY CLERK

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Ashley Wilson, being duly sworn, hereby state as follows:

1.      I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), an agency of the United States Department of Homeland Security (DHS), and have been so employed since October 2007. I am currently assigned to the Office of the Assistant Special Agent in Charge Jacksonville, Florida, where I conduct a variety of investigations. Prior to this assignment, I was assigned to the Office of the Deputy Special Agent in Charge Laredo, Texas for approximately 6 years also as a Special Agent. I have a Bachelor's degree in Criminal Justice. I am a law enforcement officer of the United States and am thus authorized by law to engage in or supervise the prevention, detection, investigation or prosecution of violations of federal criminal law. I am responsible for enforcing federal criminal statutes under the jurisdiction of HSI, including violations of law involving the exploitation of children. I participated in a 22-week training program at the Federal Law Enforcement Training Center in Brunswick, Georgia, which included the Criminal Investigator Training Program and ICE Special Agent Training. In my capacity as a Special Agent, I have participated in numerous types of investigations, during which I conducted or participated in physical surveillance, undercover transactions and operations, historical investigations, and other complex investigations. Since becoming a Special Agent, I have worked with experienced Special Agents and state and local law enforcement officers who also investigate child exploitation offenses.

2.      I have investigated and assisted in the investigation of criminal matters



involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423, as well as Florida state statutes that criminalize sexual activity with minors and other methods of child sexual exploitation. In connection with such investigations, I have served as the case agent and have served as an undercover agent in online child exploitation cases. During the course of my investigations, I have worked closely with members of the local child exploitation task force comprised of agents and officers, from HSI, the Federal Bureau of Investigation (FBI), the Florida Department of Law Enforcement (FDLE), the Jacksonville Sheriff's Office (JSO), the St. Johns County Sheriff's Office (SJSO), and the Clay County Sheriff's Office (CCSO), among other agencies. These agencies routinely share information involving the characteristics of child sex offenders as well as investigative techniques and leads. As a federal agent, I am authorized to investigate and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.    This affidavit is based upon my personal knowledge, experience and training, as well as other information developed during the course of this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, fruits, instrumentalities, other items illegally possessed and evidence of violations of 18 U.S.C. §§ 2252 and/or 2252A, are present in the location to be searched.

2

4.     I am requesting authority to search the residence specifically identified in Attachment A, which includes the physical structure, as well as any computer and computer media and electronic storage devices located therein. I also request to seize any and all items listed in Attachment B as instrumentalities, fruits, and/or evidence of criminal activity specified herein.

## STATUTORY AUTHORITY

5.     This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors. Based upon my training and experience, as well as conversations with other experienced law enforcement officers, computer forensic examiners, and federal prosecutors, I know the following:

a.     18 U.S.C. § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails.

b.     18 U.S.C. § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

c.     18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting

3

interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

      d.     18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign

4

commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.      The following definitions apply to this Affidavit:

a.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit poses or positions.

b.   "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an

5

identifiable minor is engaged in sexually explicit conduct). *See* 18 U.S.C. §§ 2252 and 2256(2).

c.   "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format. *See* 18 U.S.C. § 2256(5).

d.   "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

e.   "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.   "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices

6

(including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.   The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software,

7

documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) may assign a unique and different number to a computer at different times that it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

k.    "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending,

8

receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

l.   A "digital camera" is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

m.  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

n.  Individuals often use a Virtual Private Network (VPN) in an attempt to remain anonymous while connected to the internet. A VPN is typically a paid service that keeps an individual's web browsing secure and private. In some cases, VPNs can get past regional restrictions for various video and music-streaming sites and help individuals evade government censorship restrictions. Based on my training and experience, and conversations with other law enforcement officers, a VPN can also be used by individuals involved in illegal activity on the internet to avoid being detected by law enforcement. A VPN can be thought of as a secure tunnel between a user's computer, or any other internet-enabled device, and the destinations a user visits on the internet. The user's computer, or other internet-enabled device, connects to a VPN server, which can be located in the United States or any other foreign country. The VPN user's activity on the internet is then passed back and forth through that specific server, and as a result, it appears the user is browsing the internet from that server's geographical location instead of the user's actual computer or internet-enable device.

## COMPUTERS AND CHILD PORNOGRAPHY

7.  Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. In the past, child pornography was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and significant skill to develop and reproduce the images. There were definable costs involved with the production of pornographic images, and to distribute

these images on any scale required significant resources and significant risks. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

8.      The development of computers has radically changed the way that child pornographers manufacture, obtain, distribute and store their contraband. Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

9.      Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner. Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device. Digital cameras, as well as "smart" phones such as the Android device, have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.      The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high

resolution.

11.     The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12.     Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo!, Hotmail, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.     As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow

12



computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they can record communication in transcript form, often show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.   Computer storage devices (e.g., hard drives, compact disks ("CDs"), diskettes,

13

tapes, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.   Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media by a computer user.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15.   Based on my experience, training, and conversations with other experienced

14

agents who investigate cases involving the sexual exploitation of children, as well as court holdings expressly finding that individuals tend to collect child pornography.[1] I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a.   Many individuals who traffic in and trade images of child pornography also collect child pornography. Many individuals who collect child pornography have a sexual

---

[1] Based on my training and experience and legal instruction by Assistant U.S. Attorney Ashley Washington, I know that courts have recognized that individuals interested in child pornography tend to collect it and rarely dispose of it. *See, e.g. United States v. Toust*, 890 F.3d 1227, 1238 (11th Cir. 2018) ("observ[ing] that 'pedophiles rarely, if ever, dispose of child pornography" (collecting cases); *United States v. Boysk*, 933 F.3d 319, 330 (4th Cir. 2019) ("'widespread view' that 'collectors and distributors of child pornography value their sexually explicit materials highly, rarely if ever dispose of such material, and store it for long periods in a secure place, typically in their homes'"); *United States v. Notman*, 831 F.3d 1084, 1088 (8th Cir. 2016) (discussing "compulsive nature of the crime of possession of child pornography and the well-established hoarding habits of child pornography collectors"); *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (finding "it is well known that 'images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes'") (citing *United States v. Lamb*, 945 F. Supp. 441, 460 (N.D.N.Y. 1996) (finding "[t]he observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases. Since the materials are illegal to distribute and possess, initial collection is difficult. Having succeeded in obtaining images, collectors are unlikely to quickly destroy them. Because of their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence. This proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time." (collecting cases))).



attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.   Many individuals who collect child pornography also collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.   Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

d.   Some individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

e.   Some individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

f.   Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet. Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, and/or distribute child pornography by computer devices using the Internet often maintain and/or possess the items listed in Attachment B.

17



16.     As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials. For example, I learned from HSI Special Agent (SA) Anthony Algozzini of an investigation he conducted in 2016 in the Middle District of Florida, in which the subject had his residence searched in July 2016 pursuant to a state search warrant and his wireless telephone and computer tablet seized by the Jacksonville Sheriff's Office. The search of these devices revealed the subject knowingly possessed several images of child pornography. The subject was made aware of the ongoing investigation into the subject's commission of child pornography offenses. Approximately three months later, the subject was arrested on federal child pornography charges. On the same day as the subject's arrest, HSI executed a federal search warrant and seized a wireless telephone acquired and used by the subject after the execution of the state search warrant at his residence. Subsequent forensic examination of this wireless telephone revealed that the subject had received, possessed and viewed images of child pornography numerous times on his new device after the execution of the state search warrant and before his federal arrest.

17.     Based on my training and experience, I also know that, with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis. However, as referenced above, evidence

18

of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Furthermore, even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favorite images involving a particular child or act is often maintained on the device.

18.    Based on my training and experience, I know that within the last several years, individuals who have a sexual interest in minor children have used the internet and internet-enabled devices with increasing frequency to make contact with and attempt to establish relationships with potential child victims. These individuals may perceive that the internet provides some degree of anonymity and safety from prosecution. Because more and more children are using the internet and internet enabled devices, these individuals potentially expose more and more child victims to online sexual exploitation. These individuals may contact potential child victims through social networking websites such as Facebook and Twitter or may engage in online conversations with children through text messaging and email. During these online conversations, photographic images and links to internet websites can be easily exchanged between the individual and the targeted child. Based on my training and experience, I know that when such an individual uses text messaging, email, or other websites to have online contact with children, the internet-enabled device used, whether it is a computer, a cellular telephone, a "smart" phone such as an Android device, or a tablet such as an "iPad," often saves and maintains evidence of such contacts. This evidence can often be extracted and examined by a trained forensic examiner.

## BITTORRENT PEER TO PEER FILE SHARING

19.     Based on my training and experience, I know the following regarding Peer to Peer (hereinafter referred to as "P2P") file sharing networks, P2P client software programs, and the BitTorrent P2P file-sharing network.

20.     A phenomenon on the Internet is P2P file sharing. P2P file sharing is a method of communication available to Internet users through using special software programs. P2P file sharing programs allow groups of computers using the same file sharing network and protocols to transfer digital files from one computer system to another while connected to a network, usually on the Internet. There are multiple types of P2P file sharing networks on the Internet. To connect to a particular P2P file-sharing network, a user first obtains a P2P client software program for a particular P2P file sharing network, which can be downloaded from the Internet. A particular P2P file sharing network may have many different P2P client software programs that allow access to that particular P2P file sharing network. Additionally, a particular P2P client software program may be able to access multiple P2P file sharing networks. These P2P client software programs share common protocols for network access and file sharing. The user interface features, and configurations may vary between clients and versions of the same client.

21.     In general, P2P client software allows the user to set up file(s) on a computer to be shared on a P2P file-sharing network with other users running compatible P2P client software. A user can also obtain files by opening the P2P client software on the user's computer and conducting a search for files that are of interest and currently being shared on a P2P file-sharing network.

20

22.     Some P2P file sharing networks are designed to allow users to download files and frequently provide enhanced capabilities to reward the sharing of files by providing reduced wait periods, higher user ratings, or other benefits.  In some instances, users are not allowed to download files if they are not sharing files.  Settings within these programs control sharing thresholds.

23.     Typically, during a default installation of a P2P client software program, settings are established which configure the host computer to share files. Depending upon the P2P client software used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed.

24.     Typically, a setting establishes the location of one or more directories or folders whose contents (digital files) are made available for distribution to other P2P clients. In some clients, individual files can also be shared.

25.     Typically, a setting controls whether or not files are made available for distribution to other P2P clients.

26.     Typically, a setting controls whether or not users will be able to share portions of a file while they are in the process of downloading the entire file. This feature increases the efficiency of the network by putting more copies of file segments on the network for distribution.

27.     Typically, files being shared by P2P clients are processed by the client software. As part of this processing, a hashed algorithm value is computed for each file and/or piece of a file being shared (dependent on the P2P file sharing network), which uniquely identifies it on the network. A file (or piece of a file) processed by this hash

21

algorithm operation results in the creation of an associated hash value often referred to as a digital signature. Some hash algorithms provide a certainty exceeding 99.99 percent that two or more files with the same hash value are identical copies of the same file regardless of their file names. By using a hash algorithm to uniquely identify files on a P2P network, it improves the network efficiency. Because of this, typically, users may receive a selected file from numerous sources by accepting segments of the same file from multiple clients and then reassembling the complete file on the local computer. This is referred to as multiple source downloads. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. P2P file sharing networks use hash values to ensure exact copies of the same file are used during this process.

28.     P2P file-sharing networks, including the BitTorrent network, are frequently used to trade digital files of child pornography. These files include both image and movie files.

29.     The BitTorrent network is a very popular and publicly available P2P file-sharing network. Most computers that are part of this network are referred to as "peers." The terms "peers" and "clients" can be used interchangeably when referring to the BitTorrent network. A peer can simultaneously provide files to some peers while downloading files from other peers.

30.     The BitTorrent network can be accessed by computers running many different client programs, some of which include the BitTorrent client program, uTorrent client program, and Vuze client program. These client programs are publicly available and free

22

P2P client software programs that can be downloaded from the Internet. There are also BitTorrent client programs that are not free. These BitTorrent client programs share common protocols for network access and file sharing. The user interface features and configuration may vary between clients and versions of the same client.

31.     During the installation of typical BitTorrent network client programs, various settings are established which configure the host computer to share files. Depending upon the BitTorrent client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other BitTorrent network users to download.

32.     In order to share a file or a set of files on the BitTorrent network, a "Torrent" file needs to be created by the user that initially wants to share the file or set of files. A "Torrent" is typically a small file that describes the file(s) that are being shared, which may include information on how to locate the file(s) on the BitTorrent network. A typical BitTorrent client will have the ability to create a "Torrent" file.  It is important to note that the "Torrent" file does not contain the actual file(s) being shared, but information about the file(s) described in the "Torrent," such as the name(s) of the file(s) being referenced in the "Torrent" and the "info hash" of the "Torrent." The "info hash" is a SHA-1[2] hash value of

---

[2] SHA-1, or Secure Hash Algorithm Version 1, is a file encryption method which may be used to produce a unique digital signature of a file. Finding a file that produces the same SHA-1 value as a known file requires a search and comparison of $10^{48}$ ($2^{160}$) different files, which is computationally infeasible. The Secure Hash Algorithm (SHA) was developed by the National Institute of Standards and Technology (NIST), along with the National Security Agency (NSA), for use with the Digital Signature Standard (DSS) as specified within

the set of data describing the file(s) referred to in the "Torrent," which include the SHA-1 hash value of each file piece, the file size, and the file name(s). The "info hash" of each "Torrent" uniquely identifies the "Torrent" file on the BitTorrent network. The Torrent" file may also contain information on how to locate file(s) referenced in the "Torrent" by identifying "Trackers." "Trackers" are computers on the BitTorrent network that collate information about the peers/clients that have recently reported they are sharing the file(s) referred to in the "Torrent" file. A "Tracker" is only a pointer to peers/clients on the network who may be sharing part or all of the file(s) referred to in the "Torrent." It is important to note that the "Trackers" do not actually have the file(s) and are used to facilitate the finding of other peers/clients that have the entire file(s) or at least a portion of the file(s) available for sharing.  It should also be noted that the use of "Tracker(s)" on the BitTorrent network are not always necessary to locate peers/clients that have file(s) being shared from a particular "Torrent" file.  There are many publicly available servers on the Internet that provide BitTorrent tracker services.

33.    Once a torrent is created, in order to share the file(s) referenced in the "Torrent" file, a user typically makes the "Torrent" available to other users, such as via websites on the Internet.

34.    In order to locate "Torrent" files of interest, a typical user will use keyword searches within the BitTorrent network client itself or on websites hosting "Torrents." Once

---

the Secure Hash Standard (SHS). The United States of America has adopted the SHA-1 hash algorithm described herein as a Federal Information Processing Standard.

a "Torrent" file is located that meets the keyword search criteria, the user will download the "Torrent" file to their computer. Alternatively, a user can also search for and locate "magnet links," which is a link that enables the BitTorrent network client program itself to download the "Torrent" to the computer. In either case, a "Torrent" file is downloaded to the user's computer. The BitTorrent network client will then process that "Torrent" file in order to find "Trackers" or utilize other means that will help facilitate finding other peers/clients on the network that have all or part of the file(s) referenced in the "Torrent" file. It is again important to note that the actual file(s) referenced in the "Torrent" are actually obtained directly from other peers/clients on the BitTorrent network and not the "Trackers" themselves. Typically, the "Trackers" on the network return information about remote peers/clients that have recently reported they have the same file(s) available for sharing (based on SHA-1 "info hash" value comparison), or parts of the same file(s), referred to in the "Torrent," to include the remote peers/clients Internet Protocol (IP) addresses.[3]

35.    For example, a person interested in obtaining child pornographic images on the BitTorrent network would open the BitTorrent client application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." (It should be noted that this situation did not occur in this investigation.) The results of the torrent search are typically returned to the user's computer by displaying them on the torrent-hosting

---

[3] Computers on the Internet identify each other by an Internet Protocol or IP address. IP addresses can assist law enforcement in finding a particular computer on the Internet. IP addresses can typically lead the law enforcement officer to a particular Internet service company and that company can typically identify the account and location that used the IP address to access the Internet.

website. The hosting website will typically display information about the torrent, which can include the name of the torrent file, the name of the file(s) referred to in the torrent file, the file(s) size, and the "info hash" SHA-1 value of the torrent file. The user then selects a torrent of interest to download to his or her computer. Typically, the BitTorrent client program will then process the torrent file. The user selects from the results displaying the file(s) he or she wants to download that were referred to in the torrent file. Utilizing trackers and other BitTorrent network protocols (such as Distributed Hash Tables, Peer Exchange, and Local Peer Discovery), peers/clients are located that have recently reported they have the file(s) or parts of the file(s) referred to in the torrent file available for sharing. The file(s) is then downloaded directly from the computer(s) sharing the file. Typically, once the BitTorrent network client has downloaded part of a file(s), it may immediately begin sharing the file with other users on the network. The BitTorrent network client program succeeds in reassembling the file(s) from different sources only if it receives "pieces" with the exact SHA-1 piece hash described in the torrent file. During the download process, a typical BitTorrent client program displays the Internet Protocol address of the peers/clients that appear to be sharing part or all of the file(s) referred to in the torrent file or other methods utilized by the BitTorrent network protocols. The downloaded file is then stored in the area previously designated by the user and/or the client program. The downloaded file(s), including the torrent file, will remain until moved or deleted.

36. Typically, as described above, one method for investigators to search the BitTorrent network for users possessing and/or disseminating child pornography files is to type in search terms, based on their training and experience, that would return a torrent

filename indicative of child pornography. The investigator would then download the file(s) referred to within the torrent file and determine if the file(s) indeed contained child pornography. If so, the investigator can document the "info hash" SHA-1 hash value of this torrent file, to be compared with future identical torrent files observed on the BitTorrent network. Although transparent to the typical user, when searches are conducted, additional results are received from the trackers on other peers who recently reported to the network as having that file(s) in whole or in part, which may include the IP addresses of those peers/clients. This information can be documented by investigators and compared to those "info hash" SHA-1 hash values the investigator has obtained in the past and believes to be child pornography. This allows for the detection and investigation of computers involved in possessing, receiving, and/or distributing files of previously identified child pornography. Therefore, without even downloading the file, the investigator can compare the "info hash" SHA-1 hash value and determine with mathematical certainty that a file seen on the network is an identical copy of a child pornography file he or she has seen before.

37.    The returned list of IP addresses can include computers that are likely to be within the investigator's jurisdiction. The ability to identify the approximate location of these IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection. At this point in the investigative process, an association between a known torrent file (based upon on the "info hash" SHA-1 hash value comparison) and a computer having a specific IP address (likely to be located within a specific region) can be established.

27

38.    Once a client user is identified as recently having a file believed to be child pornography, in whole or in part, the investigator can then query that client user directly to confirm that the client user has that file, in whole or in part, and/or download that file directly from the client user exclusively, otherwise known as a single-source download. Depending upon several factors, including configuration and available resources, it might not be possible to do either. The process of sharing files on the BitTorrent network involves peers allowing other peers to copy a file or portions of a file. This sharing process does not remove the file from the computer sharing the file. This process places a copy of the file on the computer that downloaded it.

39.    If an investigator either received an affirmative response from a remote peer that they possess a digital file, or the investigator received a digital file, in whole or in part, that is believed to contain child pornography, from a remote peer at a specific IP address, the investigator can conclude that a computer, likely to be in this jurisdiction, is running a BitTorrent network P2P client and is currently possessing, receiving, and/or distributing specific and known visual depictions of child pornography.

40.    Law enforcement has created BitTorrent network client programs that obtain information from "Trackers" about peers/clients recently reporting that they are involved in sharing digital files of known actual child pornography (based on the "info hash" SHA-1 hash value), which then allows the downloading of a file from a single IP address (as opposed to obtaining the file from multiple peers/clients on the network). This procedure allows for the detection and investigation of those computers involved in sharing digital files of known actual child pornography on the BitTorrent network.

41.     During the query and/or downloading process from a remote BitTorrent network client, certain information may be exchanged between the investigator's client and the remote client they are querying and/or downloading a file from. This information can include (1) the remote client's IP address; (2) a confirmation from the remote client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) is being reported as shared from the remote client program; and (3) the remote client program and version. This information may remain on the remote client's computer system for long periods of time. The investigator has the ability to log this information. A search can later be conducted on a seized computer system(s) for this information, which may provide further evidence that the investigator's client communicated with the remote client.

42.     The investigation of P2P file sharing networks is a cooperative effort of law enforcement agencies around the country. Many of these agencies are associated with the Internet Crimes against Children Task Force Program. P2P investigative methodology has led to the issuance and execution of search warrants around the country resulting in the arrest and conviction of numerous offenders possessing and/or distributing child pornography, some of whom were also involved in the sexual exploitation of actual child victims.

43.     Computers throughout the world can download files from download candidates without regard to geographic location. I know that the files located on P2P download candidates are quickly available throughout the world due to the distributed sharing model of P2P networks.



44.     Based on my training and experience, as well as conversations with other experienced law enforcement officers, I know that cooperating police agencies pool their information to assist in identifying criminal conduct and build probable cause to further criminal investigations. With this pooled information, law enforcement officers may obtain a better understanding of the global information available about a suspect that resides within their geographic area of jurisdiction. Given the global scope of the Internet, this information is valuable when trying to establish the location of a suspect. Investigators from around the world gather and log information, which can be used by an investigator to establish probable cause for a specific investigation in his or her jurisdiction.

45.     Based on my training and experience, and my conversations with other law enforcement officers and agents, I know P2P file sharing networks are often used for illegal activity, to include the sharing and distribution of files that contain child exploitation material.

## FACTS ESTABLISHING PROBABLE CAUSE

46.     I make this affidavit in support of a search warrant for the residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, "Subject Location," that I believe to be currently occupied by Robert William Bernasco Sr, and others, after conducting physical surveillance at the Subject Location and querying the Florida Driver and Vehicle Identification Database (DAVID), a NCMEC database, and the Jacksonville Electric Authority (JEA) database. This affidavit is based upon information provided to me both verbally and in written documentation from other law enforcement officers and personnel, to include Clay County Sheriff's Office Detective and HSI Task Force Officer

30

(TFO) Andrew Koehler, as well as through an investigation that I personally conducted as set forth herein. I have personally observed the premises, and it appears as set forth in Attachment A.

47.    HSI is investigating the use of one or more computers, wireless telephones, and computer media at the Subject Location to commit violations of 18 U.S.C. §§ 2252 and 2252A, which prohibit the transportation, receipt, distribution, possession, and access with intent to view child pornography, that is, visual depictions of one or more minors engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256.

48.    In July 2021, I received an investigative lead from TFO Koehler, who conducted an online investigation on the BitTorrent network for offenders sharing child pornography. On July 9, 2021, I reviewed all of the information, reports, and files containing child exploitation material that were provided to me by TFO Koehler. Since July 9, 2021, I have also had several phone conversations with TFO Koehler about the investigation he initiated in March 2021.

49.    On March 2, 2021, TFO Koehler directed his investigative focus to a device at IP address 73.53.216.240, because it was associated with a torrent with the infohash: a6a796f2194bf77ea274df470d9131403c12b686. This torrent file references 25 files, at least one of which was identified as being a file of investigative interest to child pornography investigations, as it potentially contained child pornography. Using a computer running investigative BitTorrent software, TFO Koehler directly connected to a device at IP address 73.53.216.240 on January 31, 2021. The device reported it was using BitTorrent client software -UT355W- µTorrent 3.5.5. On January 31, 2021, a download was successfully

completed of the following 10 files that a device at IP address 73.53.216.240 made available to other users:

> File name: *!!! NEW !!! 2010 k   5yo - chunk2 FK pthc best.avi*
> SHA-1 hash value: C7PJ5PFPON4VE2PFSFOQUZD5LQVBFIDQ
>
> File name: *(Children-sf-1man)- N       (10Yo).mpg*
> SHA-1 hash value: ZIHQ6FPIAY63TIFTGUWZZ6XIUDGW4RJK
>
> File name: *(Pthc) - классика avi 640x480 (Loving,Lolita).avi*
> SHA-1 hash value: VPGYMISNLOJVW4E2T73THEBU4U5CYFUT
>
> File name: *(PTHC) JhO - K   &A      &Company.mpg*
> SHA-1 hash value: TLWSU6BQOKSLDCNNTHRXPNCISTCXD7DX
>
> File name: *5 (PTHC).mpg*
> SHA-1 hash value: QP32KWDMT3IXFWECYHSXFIY7EHL3RS76
>
> File name: *9 yo Blonde In Camping Incest(3m8s)pthc.avi*
> SHA-1 hash value: YG7PEEXBXQLDEHORX3NWHCJUTHEQXBLQ
>
> File name: *A       3 Five Yo Pthc,Pedo,Incest,Kiddy 7m35S.mpg*
> SHA-1 hash value: D4MTMTNW2SYHPSML2RG5VMHGBDQEU7D4
>
> File name: *desktop.ini*
> SHA-1 hash value: VCYR4ZH6H52VME7WNTOOTIVCP226CNOI
>
> File name: *! New ! (Pthc) T     8Yr - Tara Gets Molested By A Clown(t   Part 1).mpg*
> SHA-1 hash value: ASN6ETIHXZPQYK7UMJ7VTOKHQ3L5AOMW
>
> File name: *Russian Lolita 13 yo- SaMix (PTHC)(R@y gold).mpg*
> SHA-1 hash value: BZN2SABE7TN3AAJMZ7TUS42LX2ZTZDXM

50.     I reviewed all of the files listed above on August 2, 2021, and 9 of them contain child exploitation material. A description of the file named *!!! NEW !!! 2010 k   5yo - chunk2 FK pthc best.avi* is as follows:

32



The color video is one-minute and 25-seconds with sound that depicts a female child lying on her back that is nude from the waist down. When the video begins, an erect male penis is seen penetrating the female child's vagina. As the video continues, the male continues to force his erect penis into the female child's vagina and he says to the child, "Stay still for a minute." The male continues to penetrate the female child's vagina with his erect penis for the duration of the video. I believe the female is a prepubescent child based upon the lack of pubic hair, the overall size of her body and the fact that this video file appears to depict at least one child previously identified by law enforcement (discussed in paragraph 51). Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

51.     I obtained the unique hash value for the video files listed above on August 2, 2021. Based on my training and experience, I know that a hash value is a unique identifier based on an algorithm that is specific to a particular video and/or image, and further that hash values are used by law enforcement to identify images and videos that depict child pornography. I learned from NCMEC that the exact hash value of 6 of the 10 files listed above, to include the file named *!!! NEW !!! 2010 k    5yo - chunk2 FK pthc best.avi*, are associated with an image/video which appears to depict at least one child previously identified by law enforcement. I also learned from NCMEC that the exact hash values of 3 of the 10 files listed above are associated with files previously submitted to NCMEC's Child Recognition and Identification System.

52.     The device at IP Address 73.53.216.240 was the sole candidate for each download, and as such, each file was downloaded directly from this IP Address. On March 2, 2021, TFO Koehler conducted a query of IP address 73.53.216.240 through the American Registry for Internet Numbers (ARIN) and learned that IP address 73.53.216.240 was registered to Comcast Cable Communications, LLC.

33

53.     On March 2, 2021, TFO Koehler caused a subpoena to be issued to Comcast requesting subscriber information for IP address 73.53.216.240 on January 31, 2021, at 13:16:00 UTC, the date and time when TFO Koehler directly connected to a device using that IP address to share files containing child exploitation material over the internet. On March 15, 2021, Comcast provided the requested information to TFO Koehler, and I reviewed it in its entirety on July 9, 2021. The information provided listed the account as active and the subscriber as Anna Boston residing at the Subject Location. The phone number listed on the account is (904) 450-9909.

54.     Through further investigation, TFO Koehler learned about additional downloads from a device at the same IP address, 73.53.216.240, that was associated with a torrent with the infohash: 64a33fa034ad1f7b3b9020712a34bf9141811b47. This torrent file references 41 files, at least one of which was identified as being a file of investigative interest to child pornography investigations, as it potentially contained child pornography. Using a computer running investigative BitTorrent software, TFO Koehler directly connected to a device at IP address 73.53.216.240 again on April 3, 2021. The device reported it was using BitTorrent client software -UT355W- µTorrent 3.5.5. On April 3, 2021, a download was successfully completed of the following 16 files that a device at IP address 73.53.216.240 made available to other users:

> File name: *K      Pthc - Superexcellente!! (((Kingpass)))         (a03).avi*
> SHA-1 hash value: 65HDBCPVSSHBJ6XWU7RUSDYLSG6EAQLH
>
> File name: *(Hussyfan) (pthc) (r@ygold) Preteen Asian A.      , 11yo        · (*
> *Filipina ) child prostitute XXX HC Pedo ptsc.mpg*
> SHA-1 hash value: PTHLO5BOYYKWDSYZHS5FDMEBEGVRESTS

File name: *B63-[ R@ygold PTHC Hussyfan Kingpass ] 11yo Girl fucked by Daddy.mpg*
SHA-1 hash value: XCBMY4M5PIKNZ3O6J7E27JN5S3KYNPHG

File name: *(Pthc) 10Yo L - Dando A Bucetinha Pro Papai Pedo Kingpass Ptsc Hussyfan Lolita.avi*
SHA-1 hash value: KGO66522HFBH5NJTQG2HGVTZHENDIPAU

File name: *(Hussyfan Pthc R@Ygold Babyshivid) M 8Yo.avi*
SHA-1 hash value: 7TVKVLHNUCTWUPM3XXULNDIINGXJO6YY

File name: *awesome preteen compilation 2.mpg*
SHA-1 hash value: IL5JFEALEOFVEDDEDLDG55PYP7K3XOCI

File name: *PTHC !!-NEW-!!-S (11yo).mpg*
SHA-1 hash value: MOWDF2GJNGK6INVR3AJ26NDP6SA6PFO7

File name: *16Yo Thai Girl With Two Boys, 18Yo And 17Yo Shaved Recomendo Flagras Big Brotherl.mpg*
SHA-1 hash value: 5C7IHYZBSJK6LWIMBDOPY4MPFL32YF42

File name: *stickam-rach_13yo love-bate1a.avi*
SHA-1 hash value: G3IIZURIWWJWE6H355RGFO2E26PMNRJD

File name: *webcam girl - 10yo New ilovedauntem10 & 11yo sisters flash pussy on webcam pthc.avi*
SHA-1 hash value: 6346OCD5FR7YSVSSLRRPSPCIETA5TDFA

File name: *9 yo Blonde Daughter Fingered In Camping Tent Incest(3m8s).avi*
SHA-1 hash value: ZAKBDDIX6N4NSBCIKCZ6SUK2B7VWDC66

File name: *V String Bikini Pthc 11Yo Pedofilia.mpg*
SHA-1 hash value: YUOXWRMPCR6UAGBPNBRAVHPUHRKD7IBY

File name: *3+4yr 2 Girls children sexually abused BEAUTIFUL_Venezuela part-2) .mpg*
SHA-1 hash value: DFF6V7BITVLKXZ26UWXZMMMMKY7NO2LO

File name: *! New ! (Kinderkutje) (Pthc) B Priv 12Yo.avi*
SHA-1 hash value: CYVPV4623AEL4GJD6GLQGHAX4GOE7M6I

File name: *(Pthc) 6Yo Babyj - Bedtime Rape .mpg*



JRK

SHA-1 hash value: 3Y75TD6UKJ3YJPBAPOE6Z6CYX3XTZDQ3

File name: *15 yo girl ri21 year old teen virgin raped(Get THIS).mpg*
SHA-1 hash value: 2C5GVCO24IQIZLJW24WRWEYFZRQAXDLX

55.    I reviewed all of the files listed above on August 2, 2021, and all of them

contain child exploitation material. A description of the file named *(Hussyfan Pthc R@Ygold*

*Babyshivid) M     8Yo.avi* is as follows:

> The color video is approximately 13 minutes and 1 second with sound that
> depicts a prepubescent female performing oral sex on an adult male. The
> female child is instructed by the adult male to stand up and take her clothes
> off. The adult male adds, "Stop crying." The female child is completely nude
> in the video. The adult male instructs the female child to get on the bed and
> continue performing oral sex on him. The adult male then instructs the female
> child to lay on the bed and rubs his erect penis on the female child's vagina
> and anus. The adult male then straddles the female child's torso and ejaculates
> on the child's face, neck and chest. I believe the female is a prepubescent child
> based upon the lack of pubic hair, lack of breast development, child-like facial
> features, and the overall size of her body. Based on my training and
> experience, I believe the file depicts at least one minor engaged in sexually
> explicit conduct, and therefore constitutes child pornography pursuant to 18
> U.S.C. § 2256.

56.    I obtained the unique hash value for the video files listed above on August 2,

2021. I learned from NCMEC that the exact hash value of 5 of the 16 files listed above, to

include the file named *(Hussyfan Pthc R@Ygold Babyshivid) M     8Yo.avi,* are associated

with an image/video which appears to depict at least one child previously identified by law

enforcement. I also learned from NCMEC that the exact hash values of 11 of the 16 files

listed above are associated with files previously submitted to NCMEC's Child Recognition

and Identification System.

57.    On July 9, 2021, I caused a summons to be issued to Comcast requesting

36



subscriber information for IP address 73.53.216.240 on April 3, 2021, from 12:17:00 UTC to 19:14:00 UTC, the date and time when TFO Koehler directly connected to a device using that IP address to share files containing child exploitation material over the internet. I also requested the current subscriber of service at the Subject Location. On July 21, 2021, Comcast provided the requested information and I reviewed it in its entirety on July 22, 2021. The information provided listed the account as active and the subscriber as Anna Boston residing at the Subject Location. The phone numbers listed on the account are (904) 450-9909 and (904) 375-8306. According to Comcast, this is still the current subscriber of service at the Subject Location as of July 9, 2021, the date of the summons.

58.    On July 29, 2021, I conducted additional research on the Subject Location and learned by researching DAVID that Anna Anderson Boston, date of birth:        1961, (since 2011), Charles Lelande Boston, date of birth:        1990 (since 2012), and Robert William Bernasco Sr, date of birth:        1967, (since 2014) list the Subject Location as their residential address on their driver's licenses. Carrie April Daniels, date of birth:        1980, lists the Subject Location as a mailing address since September 2020.

59.    On July 29, 2021, I conducted a query of the JEA database for a residential utility account located at 606 Park Avenue, Apartment 604 in Orange Park and discovered the account is active in the name of Anna Boston. The phone numbers listed on the account are (904) 450-9909 and (904) 213-9744.

60.    On July 29, 2021, I requested information from the United States Postal Service (USPS) regarding the Subject Location and received a response on July 30, 2021. According to USPS records, the residents receiving mail at the Subject Location are Charles

Boston, Anna Boston, and First Name Unknown (FNU) Bernasco, and FNU Daniels.

61.     On July 30, 2021, I conducted visual surveillance at the Subject Location. At approximately 9:00 AM, I observed Apartment 604 and learned it is on the second floor of building six (6).

62.     On August 3, 2021, I caused a summons to be issued to the Promenade Park Apartments requesting information on the tenants currently residing in the apartments in building 6.  On the same day, the Promenade Park Apartments personnel provided the requested information and I reviewed it in its entirety.  The information provided listed Robert Bernasco as the only tenant residing in Apartment 604. According to apartment records, Bernasco moved into the Subject Location on November 13, 2009, and the phone number on the account is (904) 450-0963.

63.     On August 3, 2021, I conducted visual surveillance at the Subject Location. At approximately 4:30 PM, I observed a white Chevrolet truck bearing Florida license plate PAEM97 pull into the apartment complex and park directly in front of the stairs leading up to the Subject Location. I then observed an adult male and adult female exit the Chevrolet truck, walk up the stairs, and enter the Subject Location. According to DAVID, the 2020 white Chevrolet truck bearing Florida license plate PAEM97 is registered to Charles Lelande Boston at the Subject Location. As the two individuals exited the truck and walk into the Subject Location, I noticed the male appeared to be the same individual depicted in the DAVID photograph for Charles Lelande Boston and the female appeared to be the same individual depicted in the DAVID photograph for Carrie April Daniels. I have reviewed numerous photos of Charles Lelande Boston and Carrie April Daniels on their

Facebook pages and have also seen their driver license photos in DAVID.

## CONCLUSION

64.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computer devices, smart phones, and/or electronic storage media located in the residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073 more fully described in Attachment A to this affidavit to, among other things, receive, transport, distribute, possess and seek child pornography. Therefore, I have probable cause to believe that one or more individuals, using the Subject Location described above has violated 18 U.S.C. §§ 2252 and/or 2252A. Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one computer device and/or other electronic storage media containing images and/or video depicting child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence.

ASHLEY WILSON, Special Agent
Homeland Security Investigations

Sworn and subscribed to via telephonic means on this 11ᵗʰ day of August 2021, in Jacksonville, Florida:

JAMES R. KLINDT
United States Magistrate Judge

39

## ATTACHMENT A

## RESIDENCE TO BE SEARCHED

The residence to be searched is an apartment residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, and within the community referred to as "Promenade Park Apartments." The apartment complex can be accessed by turning into its entrance from Park Avenue. Building 6 is located in the back of the apartment complex and it is the last building on the left after turning into the first entrance road of the apartment complex. Building 6 is a two-story, multi-unit, tan colored building with brown colored shingles on the roof. On its exterior, there is a sign that reads "6" affixed to the center of the building. There are 12 apartments in Building 6 and multiple windows can be seen from the parking lot. There is a sidewalk that leads to tan colored stairs from the parking lot. The tan colored stairs lead to the second floor, directly in front of Apartment 604. The front door to Apartment 604 can be seen from the parking lot and faces west. It is a dark colored door and has a silver kick plate on the bottom of it. The door handle and dead bolt are located on right side of the door. The numbers "604" are black in color and located above the front door of the apartment.







2

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.     Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones such as an Apple iPhone or a mobile device using the Android operating system, electronic tablets such as an Apple iPad or a tablet using the Android operating system, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.     Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, transportation, distribution or seeking of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, transportation, distribution or seeking of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of seeking, distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any

2

visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs

and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.    Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4

14.   Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.   Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.   Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.   Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

5

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☐ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*

The residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, as further described in Attachment A

) ) ) ) ) )

Case No.  3:21-mj- 1382-JRK

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Middle_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

the residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, as further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before   8-19-2021   *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____James R. Klindt_____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    8-11-2021   at  10:24 AM          *signature*
                                                                        *Judge's signature*

City and state:   Jacksonville, Florida          James R. Klindt, United States Magistrate Judge
                                                                  *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>3:21-mj- 1382-JRK | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

Certification:
I declare under penalty of perjury that this inventory is correct and was returned electronically along with the warrant to the designated judge pursuant to Fed. R. Crim. P. 4.1 and 41(f)(1)(D).

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____


_____
*Executing officer's signature*


_____
*Printed name and title*

## ATTACHMENT A

## RESIDENCE TO BE SEARCHED

The residence to be searched is an apartment residence located at 606 Park Avenue, Apartment 604, Orange Park, Florida 32073, and within the community referred to as "Promenade Park Apartments." The apartment complex can be accessed by turning into its entrance from Park Avenue. Building 6 is located in the back of the apartment complex and it is the last building on the left after turning into the first entrance road of the apartment complex.  Building 6 is a two-story, multi-unit, tan colored building with brown colored shingles on the roof. On its exterior, there is a sign that reads "6" affixed to the center of the building.  There are 12 apartments in Building 6 and multiple windows can be seen from the parking lot. There is a sidewalk that leads to tan colored stairs from the parking lot.  The tan colored stairs lead to the second floor, directly in front of Apartment 604. The front door to Apartment 604 can be seen from the parking lot and faces west. It is a dark colored door and has a silver kick plate on the bottom of it. The door handle and dead bolt are located on right side of the door. The numbers "604" are black in color and located above the front door of the apartment.

JRK







2

JRK

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.     Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones such as an Apple iPhone or a mobile device using the Android operating system, electronic tablets such as an Apple iPad or a tablet using the Android operating system, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, transportation, distribution or seeking of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, transportation, distribution or seeking of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4.      In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.      Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of seeking, distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.      Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any

visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs

3

JRK

and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.     Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

4

14.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.    Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.    Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17.    Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

5